# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2680 | **DATE** | 3/28/2003 |
| **CASE TITLE** | CENTRAL STATES SOUTHEAST AND vs. THE KROGER CO., an Ohio Corporation | | |

MOTION:

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 4/14/2003 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the foregoing reasons, Central States motion for summary judgment and Kroger's cross motion for summary judgment are denied [30-1,32-1]. ENTER MEMORANDUM OPINION AND ORDER.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | MAR 3 1 2003 |
| ✓ | Docketing to mail notices. | date docketed |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | docketing deputy initials |

CG   courtroom deputy's initials

U.S. DISTRICT COURT CLERK

03 MAR 31 AM 8: 19

FILED-ED 10

Date/time received in central Clerk's Office

mailing deputy initials

Document Number

46

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CENTRAL STATES, SOUTHEAST AND ) 
SOUTHWEST AREAS PENSION FUND, ) 
And HOWARD McDOUGALL, trustee, ) 
                               ) 
Plaintiffs, ) 
                               ) 
         -vs-                )       Case No. 01 C 2680
                               )       Judge Ronald A. Guzman
THE KROGER CO., an Ohio ) 
Corporation, ) 
                               ) 
              Defendant. ) 

DOCKETED
MAR 3 1 2003

## MEMORANDUM OPINION AND ORDER

Pending are the parties' cross motions for summary judgment pursuant to Fed.Civ. Proc. 56. For the reasons set forth below the parties' cross motions for summary judgment are denied.

## BACKGROUND FACTS

This case presents the second federal district court complaint filed by Central States, Southeast and Southwest Areas Pension Fund ("Central States") to collect unpaid pension fund contributions from The Kroger Co. ("Kroger") on behalf of certain employees at Kroger's Atlanta warehouse facility. The first complaint, filed in 1993, spawned two Seventh Circuit opinions. *Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co.*, 73 F.3d 727 (7th Cir. 1996) ("*Kroger I*"); and *Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co.*, 226 F.3d 903 (7th Cir. 2000) ("*Kroger II*"). An explanation of the facts surrounding those opinions is necessary to understand the present action.

Kroger is a national grocery store chain that operates a distribution and warehouse center in Atlanta. *Kroger I*, 73 F.3d at 729. Local 528 of the International Brotherhood of Teamsters

1

46

represents the warehouse employees and truck drivers who work at the Atlanta facility. *Id.* The

employment relationship is governed by a collective bargaining agreement ("CBA"). *Id.* The

CBA consists of the two parts: a Master Agreement negotiated by Kroger and the Teamsters and

covers several facilities nation wide including the Atlanta facility; and a Local Supplement

negotiated by the Atlanta facility and Local 528 and applies to the Atlanta facility alone. *Id.*

The Master Agreement of the CBA provided for three types of employees: "regular"

employees; "probationary" employees; and "casual" employees. *Id.* Section 2.2 of the Master

Agreement defined "probationary" employees as new employees who work on a trial basis for

thirty days not to exceed sixty calendar days, and may be discharged at the discretion of the

employer.[1] *Id.* After the trial period the employee "shall be placed on the regular seniority list."

*Id.* The Master Agreement defined "casual" employees as employees "hired on a short-term

basis" as may be employed from time to time. *Id.* Casual employees were permitted only at

facilities with a past practice of hiring casuals and the total number hired could not exceed ten

percent of the work force. *Id.* Under the Master Agreement, Kroger was required to make

pension contributions on behalf of all employees who had worked for thirty days and had been

placed on the regular seniority list. *Id.* As such, Kroger was obligated to make pension

contributions on behalf of probationary employees that had completed the trial period but not on

behalf of casual employees. *Id.*

The Local Supplement used different terms to describe employees at the Atlanta facility.

*Id.* The Local Supplement referred to "full-time" employees and "part-time" employees. Neither

term was defined. *Id.* However, the following characteristics regarding the term "part-time"

---

[1] The Master Agreement for the years 1976 through 1979 defined the trial period as thirty days of work.
(Pls.' Rule 56.1 Facts at ¶ 36). All subsequent Master Agreements defined the trial period as thirty days of work not
to exceed sixty calendar days. (Pls.' Rule 56.1 Facts at ¶ 37).

emerged from the Local Supplement: (1) part-time employees were permitted to accrue seniority "only among other part-time employees"; and (2) there were certain job-bidding procedures pertaining to part-time employees.[2] *Id.*

Prior to 1977, Kroger designated all newly hired employees at the Atlanta facility as probationary employees. *Id.* Kroger changed the designation of newly hired employees to casual in 1977. *Id.* Many of those casual employees remained with Kroger for long periods of time and eventually became regular employees. *Id.* Kroger began making pension contributions on behalf of those employees once they were placed on the regular employee list. *Id.* However, Kroger did not make pension contributions on behalf of those employees as long as they remained casual, a period that could last several months. *Id.*

In 1991, Central States conducted an audit of the Atlanta facility's employment records covering the period from December 28, 1986 through December 30, 1989. (Pls.' Rule 56.1 Facts at ¶ 81).[3] Central States determined that the employees designated as casuals were, in fact, probationary employees. *Kroger I*, F.3d at 729. Central States then brought the first action on June 18, 1993 under 29 U.S.C. § § 1132 and 1145 claiming that Kroger owed pension contributions on behalf of those employees from the day following their thirtieth day of work. *Id.* at 729-30. Kroger defended on the grounds that no obligation to pay pension contributions existed until the employees were placed on the regular seniority list because they remained casuals until that time. *Id.* at 30. Both parties moved for summary judgment before the district court. *Id.*

---

[2] In 1985, the Local Supplement required "part-time" employees to bid on available permanent positions. (Pls.' Rule 56.1 Facts at ¶ 46). In 1988 the bidding procedure was modified so that "part-time" employees were given the opportunity, but not required, to bid on available permanent positions. (Pls.' Rule 56.1 Facts at ¶ 48).

[3] Pls.' Rule 56.1 Facts ¶ 81,mistakenly states that the period covered by the audit began on December 26, 1986 but the period actually began on December 28, 1986 as is evidenced by the fact that Central States' suit was for unpaid pension contributions beginning on that date.

The district court granted summary judgment in favor Kroger. *Id.* The crux of that decision was the interpretation of the term "part-time" employee in the Local Supplement. *Id.* The district court acknowledged that the Master Agreement required Kroger to contribute on behalf of full-time and part-time regular employees. *Id.* The district court also acknowledged the fixed meaning of the terms "full-time" and "part-time" as regular employees that work a forty-hour week and regular employees that work less than forty-hours. *Id.* Nonetheless, the district court interpreted the term "part-time" in the Local Supplement as unambiguously describing the same employees defined as "casual" in the Master Agreement. *Id.*

On January 10, 1996 the Seventh Circuit reversed the district court in *Kroger I. Id.* at 733. The Seventh Circuit found that, in order to avoid ambiguity in the term "part-time", the district court read the CBA as a combination of two agreements that did not require harmonization of terms. *Id.* at 731. The Seventh Circuit declined to accept the district court's conclusion and held that the two agreements formed a single, unitary contract. *Id.* The Seventh Circuit held that the term "part-time" was ambiguous because the parties to the agreement suggested different yet reasonable interpretations. *Id.* at 732. The Court explained that the term could refer to regular employees who worked less than a regular work week or to casual employees. *Id.* As such, it was for the trier of fact to resolve the question of interpretation. *Id.* at 733. Finally, the Court stated that "only if the employees in question were truly casual, and not probationary, [as defined by the CBA], was Kroger's reclassification of the Atlanta employees permissible." *Id.* After a bench trial the district court found that the term "part-time" employee referred to probationary or regular part-time employees and not casual employees. Specifically, the district court found: (1) that "the employees in question were not hired on a short-term basis," nor were they employed from time to time, . . ." as defined by the Master Agreement; (2)

that the term "part-time" in the Local Supplement did not mean "casual" as defined in the Master Agreement; (3) that the local union representatives accepted the treatment of all new hires as "part-timers" not entitled to pension and welfare contributions from "at least 1977 to the end of the audit period and beyond"; and (4) that the term "part-time" in the Local Supplement was interpreted by Kroger and Local 528 as referring to these employees. *Kroger II*, 226 F.3d at 908-09. Despite the last two findings, the district court concluded that *the employees in question* were "part-time" regular or "probationary" employees but not "casual" employees. *Id.* at 910. In so doing the district court observed that the employees in question were not hired on a "short-term basis" because Kroger hired them with the hope and expectation that they would become full-time regular employees when an opening occurred. *Id.* at 909. This was so even though Kroger may have known that there was nothing inevitable about its employees becoming full-time regular employees. *Id.* at 909. The district court also concluded that the employees in question were not "employed from time to time," because that referred to "people who come and go, people whose employment is interrupted, people who might be absent for long periods of time," and not to "people who are on hand continuously to work part-time as needed." *Id.* (internal quotation omitted). The district court found that the employees in question were available, and considered to be available by Kroger, "on a continuous basis to work part-time as needed . . ." *Id.* It was expected that the employees in question would work for long periods of time both as part-timers and eventually regular employees on the seniority list. *Id.* Finally, the district court concluded that its third and fourth findings amounted to "local understandings" that could not "prevail against the definition of probationary employees contained in the Master Agreement." As a result, Kroger was found liable for the unpaid pension contributions on behalf of the employees in question. *Id.* at 910.

Kroger's appeal resulted in the Seventh Circuit's *Kroger II* opinion. On September 15, 2000, the Seventh Circuit affirmed the findings and ruling of the district court. *Id.* at 915. The Court of Appeals agreed that the term "casual" referred to those employees Kroger intended, *when it hired them*, to work for a short period of time and not those employees expected, "in the normal course," to work for long periods of time. *Id.* at 912. The Court then reviewed the application of that definition to the facts before the district court, specifically, the interpretation of the term "part-time." *Id.* The Court explained that when interpreting an ambiguous term, a district court must determine "what the contracting parties . . . intended the clause to mean." *Id.* at 910. The Court agreed with Kroger that, in general, the practical interpretation of a contract applied by the parties is strong evidence of their intended meaning of an ambiguous term. *Id.* at 913. The Court stated, however, that Kroger could not rely on the practical interpretation if it contravened an express and unambiguous term of the CBA, *Id.* at 914, as it did in that case. The Court also explained that a district court is permitted to examine extrinsic evidence to determine the meaning the parties attached to an ambiguous term. *Id.* at 911. The Court then stated that there was sufficient evidence to support the district court's finding that the employees in question were not casual employees and thus, the finding was not clear error. *Id.* at 913. In particular, the Court agreed that "[t]he ability to bid on permanent jobs [was] entirely at odds with the concept of casual employment . . ." *Id.* at 913 (internal quotation omitted). Because the Court of Appeals had previously held that Kroger's reclassification of it employees would be permissible only if the employees in question were truly casual, *Kroger II*, 226 F.3d at 912 (citing *Kroger I*, 73 F.3d at 733, the Court of Appeals affirmed the district court's ruling on liability. *Kroger II*, 226 F.3d at 912.

Central States then filed this action against Kroger under 29 U.S.C. §§ 1132 & 1145 for

unpaid pension contributions on behalf of all newly hired Atlanta facility employees from 1977 through May 24, 1993, excluding the previously litigated time period of December 28, 1986 through December 30, 1989. (¶ 30 of Compl.). On August 2, 2002, both parties filed for summary judgment pursuant to Fed.R.Civ. Proc. 56.

Central States argues that the doctrine of collateral estoppel warrants summary judgment in its favor. (Pls.' Mem. at 6-9). Specifically, Central States argues that the factual issue before this Court, the status of Kroger's "casual" employees after 1977, was the subject of the previous litigation (Pls.' Rule 56.1 Facts at ¶ 65); that the district court's four findings resolved the status issue of all employees' hired after 1977 (Pls.' Rule 56.1 Facts at ¶ 68); and that the resolution of the status of all employees' hired after 1977 was necessary to the result in the prior litigation.[4] (Pls. Mem. at 7).

On the other hand, Kroger contends that collateral estoppel is inappropriate because the district court resolved the status of Kroger's new employees hired between the dates of December 28, 1986 through December 30, 1989 only. (Defs.' Resp. to Pls.' Rule 56.1 Facts at ¶ ¶ 65, 66, 68 & 75). Central States also argues that summary judgment is proper under the doctrine of *stare decisis*.[5]

Kroger further argues that Central States' claims, at least in part, are barred by the applicable statute of limitations (Def's. Mem. at 5-12) and/or *laches* (Def's. Mem. at 12-15). Kroger claims that the appropriate statute of limitations to be applied in this case is the five-year

---

[4] Central States' memorandum in support of summary judgment states that the decision in *Kroger I* warrants summary judgment but cites to *Kroger II*. (Pls.' Mem. at 6-10.) It is clear from the argument that Central States relies on the decision in *Kroger II*. *Kroger I* addressed the reading of the Master Agreement and Local Supplement as forming a single, unitary contract, *Kroger I* 73 F.3d at 732, while *Kroger II* addressed the district court's findings regarding the status of the employees and Kroger's estoppel defense. *Kroger II*, 226 F.3d at 908-915.

[5] These issues form the basis for Central States argument that summary judgment is warranted. The other issues covered in its memorandum are responses to Kroger's defenses and arguments for summary judgment.

statute of limitations applicable to the Illinois Wage and Benefit Payment Actions (Def's. Mem. at 5-7) or the limitations period contained in 29 U.S.C. § 1451(f), concerning ERISA debt collection suits (Def's. Mem. at 7-9), despite the fact that the Trust Agreement provides for Illinois' ten-year written contract limitations period. (Pls.' Rule 56.1 Facts at ¶ 108). Central States responds that the ten-year limitations period is binding on both parties (*Id.*) and that all of its claims are preserved as a result of a previously signed tolling agreement with Kroger. (Pls.' Mem. at 11-13).

Finally, Kroger argues in the alternative that, because Central States either knew or should have known of its employee labeling practices as early as 1975 and no later than 1987, Central States claims are barred by *laches*. (Def's. Mem. at 12-17). Central States claims that Kroger is precluded from arguing *laches* based on the denial of its estoppel defense in the previous litigation. (Pls.' Mem. at 13-15). Central States also challenges the applicability of *laches* to ERISA actions and that, regardless of its applicability, Kroger has not satisfied the elements necessary to establish a *laches* defense. (*Id.*). The parties arguments will be addressed in turn.

## DISCUSSION

Summary judgment is in order "when no genuine issues of material fact exist and when the moving party is entitled to judgment as a matter of law." *Central States v. Bell Transit Co.*, 22 F.3d 706, 710 (7th Cir. 1994). Cross-motions for summary judgment require the Court to "construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001). On each side's current motion this Court "is not required to draw every conceivable inference from the record – only those inferences that are reasonable" – in the light most favorable to the nonmovant. *Bank*

*Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991). Because both Central States and Kroger have moved for summary judgment, it is necessary to adopt a dual perspective which requires the denial of both motions. I. Central States' Motion for Summary Judgment

### Collateral Estoppel

Under the doctrine of collateral estoppel, a party cannot litigate a previously adjudicated issue in a subsequent lawsuit if the resolution of that issue was necessary to the prior judgment. *Kunzelman v. Thompson*, 799 F.2d 1172, 1176 (7th Cir. 1986). There are four essential elements to the application of collateral estoppel are: "(1) the party against whom collateral estoppel is asserted must have been fully represented in the prior litigation; (2) the issue sought to be precluded must be identical to an issue involved in the prior litigation; (3) the issue must have been actually litigated and decided on the merits in the prior litigation; and (4) the resolution of that issue must have been necessary to the court's judgment." *Gray v. Lacke*, 885 F.2d 399, 406 (7th Cir. 1989); *Kraushaar v. Flanigan*, 45 F.3d 1040, 1050 (7th Cir. 1995).

In order to be actually litigated and decided on the merits the issue "must have been distinctly put in issue and directly determined" in the previous action to be preclusive in the later. *Adkins v. Comm'r of Internal Revenue*, 875 F.2d 137, 141 (7th Cir. 1989)(internal quotation omitted). Further, preclusion "attaches only to determinations that were necessary to support the judgment entered in the first action." *Jacobs v. Marathon County, Wisc.*, 73 F.3d 164, 168 (7th Cir. 1996) cert denied, 517 U.S. 1251 (1996); *see also Truck Insurance Exchange v. Ashland Oil, Inc.*, 951 F.2d 787, 792 (7th Cir. 1992)(citing *Brown v. Flesen*, 442 U.S. 127, 139 (1979)(stating that collateral estoppel applies only if the adjudication of an issue was necessary to the judgment). Thus, the imposition of collateral estoppel is improper if the relevant factual finding was not critical and essential to the earlier case "and therefore offered the parties little

incentive to litigate." *Amoco Oil. Co. v. Johnstone*, 856 F.2d 967, 969 (7th Cir. 1988). The party claiming the applicability of collateral estoppel has the burden of proving the four elements. *A.J. Canfield Co. v. Vess Beverages, Inc.*, 859 F. 2d 36, 37 (7th Cir. 1988).

Central State's collateral estoppel argument fails for several reasons. The parties do not dispute that the first element is satisfied. As to the second element, the issue sought to be precluded is not identical to the issues involved in the prior litigation. The issue decided in the previous litigation was Kroger's liability for pension contributions on behalf of newly hired employees hired between the years 1987 through 1989. That issue was resolved by an examination of Kroger's intent when it hired *those* employees. This fact is evidence by the complaint in the previous action as well as the Court of Appeals' mandate on remand in *Kroger I.*

In *Kroger I* the complaint alleged that Kroger reported employee work history to the Pension Fund between December, 1986 through December 1989. (¶ 12 of 1993 Complaint). The complaint also alleged that the Pension Fund audited the accuracy and completeness of the employee work history reported during the period of December 28, 1986 through December 30, 1989. (¶ 15 of 1993 Complaint). Central States alleged that the audit revealed that Kroger violated the collective bargaining agreement and ERISA by failing to accurately report employee work history and pay contributions to the fund for the period of December 28, 1986 through December 30, 1989. (¶ 19 of 1993 Complaint). Finally, Central States requested a judgment against Kroger for contributions owed only for the period covering December 28, 1986 through December 30, 1989. (¶ 1 of Plaintiff's request in 1993 Complaint). The accuracy of the work history reported for new employees hired between December 28, 1986 through December 30, 1989 was the issue in the prior litigation.

We turn next to the Seventh Circuit's mandate in *Kroger I*. In *Kroger I*, the Seventh

Circuit determined that use of the term "casual" in the Master Agreement and "part-time" in the

Local Supplement created an ambiguity in the CBA. *Kroger I*, 73 F.3d at 732. The Court

concluded that "only if the *employees at issue* were truly casual, and not probationary, was

Kroger's reclassification permissible." *Id.* at 733 (emphasis added). Because Central States

sought contributions for the employees hired between December 28, 1986 through December 30,

1989 it was those employees alone that were the employees at issue. Thus, the Court of Appeals

remanded the case to the district court for a determination of whether the newly hired employees

between December 28, 1986 through December 30, 1989, were casual or probationary.

Therefore, the status of the employees hired from 1977 through 1986 and 1990 through 1993

was not put before the district court.

In this action the Court is called upon to determine the accuracy of the work history

reported by Kroger for employees hired between 1977 through 1987 and 1990 through 1993.

Like the previous litigation, Kroger's liability will be based on the status of Kroger's newly

hired employees. However, the determination of that issue in the prior litigation was based on

Kroger's intent *when it hired* those employees. Thus, the issue before this Court is Kroger's

intent when it hired the employees at issue in the current litigation, i.e., the employees hired

between 1977 through 1986 and 1990 through 1993. Thus, the factual issues before the court in

the prior litigation are not identical to the factual issues in this action.

As for the third element, the issue before this Court was not actually litigated and decided

on the merits in prior litigation. The status of the newly hired employees at issue in this action

was not distinctly put in issue nor directly determined in previous action. The only issue put

before the district court in the prior litigation was Kroger's liability for pension contributions on

behalf of newly hired employees between 1986 through 1989. That issue was resolved by a

determination of Kroger's intent when it hired *those* employees. Thus, the district court in the

prior litigation decided only the status of Kroger's newly hired employees hired between the

years 1987 through 1989. This fact is evidenced by the district court's findings of fact and

decision on liability as well as the Court of Appeals affirmation in the prior litigation.

The district court first found that the employees in question were not "hired on a short-term

basis," or "employed from time to time" as defined by the Master Agreement. (Tr.8-B at 1005).

The second finding was that the term "part-time" contained in the local supplement did not mean

the same as "casual" in the Master Agreement. (Tr.8-B at 1005). The third finding was that

Local 528 acquiesced to the treatment of all newly hired "part-time" employees, "from at least

1977 through the end of the audit period and beyond," as not entitled to pension contributions.

(Tr.8-B at 1005). The fourth finding was that the term "part-time" referred to those employees

that had not been placed on the regular seniority list and were not eligible for pension

contributions. (Tr.8-B at 1006). On these findings, the district court concluded that the

*employees in question* could not have been casual, and therefore must have been probationary

employees entitled to pension contributions. (Decision on Liability at 5). Nowhere in the district

court's findings of fact or decision on liability is it stated that all newly hired employees, from

1977 through 1993, must have been probationary and entitled to pension contributions. Rather,

the district court continually refers to the employees as the employees in question. (Tr.8-B at

1005, Decision on Liability at 5). It has already been noted that the employees in question were

the employees hired between December 28, 1986 through December 30, 1989. Consequently,

the only issued directly determined by the district court in the prior litigation was that the newly

hired employees between December 28, 1986 through December 30, 1989 were probationary

12

employees and that Kroger was liable for pension contributions on their behalf. The only reference to the years 1977 and beyond relate to how the employees hired after that time were treated, not to whether all those employees were casual or probationary. Central States claims that the evidence submitted in the prior litigation spanned the entire period from 1977 through 1993 to support its claim that the district court's determination applied to all employees hired during that period. (Plaintiff's 56.1 facts at ¶ 88). However, it may be that the district court reviewed evidence spanning the entire period and considered it relevant to Kroger's intent between December 28, 1986 through December 30, 1989 and ultimately the status of the employees during that time period. However, it does not necessarily follow that, because the district court considered evidence spanning the entire time period, it must have made a determination as to the status of all the employees during that time period. *See Jacobs*, 73 F.3d at 168 (finding flaw in collateral estoppel argument because it focused on what the trier of fact *might* have decided rather than what it *must* have decided). In order to find Kroger liable for pension contributions on behalf of employees hired between 1987 through 1989 the only fact the district court must have decided was that those employees were probationary, not casual. In particular, there are significant differences in the CBA's from 1977 through 1993 suggesting that the district court limited its determination to the employees hired between 1987 through 1989. Under the 1985-1988 CBA "part-time" employees were required to bid for regular jobs. *Kroger II*, 226 F.3d at 913. The Court of Appeals specifically agreed with the district court that this procedure was completely at odds with the concept of casual employment. *Id.* However, there was no such bidding requirement contained in the CBA's in place prior to 1985.[6] (Plaintiff's

---

[6] Plaintiff states that, prior to 1985, "part-time" employees were authorized, but not required, to bid for full-time employment. (Plaintiff's 56.1 Facts at ¶ 47). However, the evidence cited does not necessary support that proposition. The relevant sections of the local supplements in place prior to 1985 state that a permanent job vacancy will be filled by the employee with the most seniority. (Plaintiff's Exhibit D-G at A-7, Exhibit D-H at A-12, Exhibit D-I at A-12). While the sections do state that part-time employees will not accrue seniority over full-time employees,

Exhibit D-G at A-7, Exhibit D-H at A-12, Exhibit D-I at A-12). Of course it is impossible to determine what weight the district court may have placed on these differences. Nonetheless, it lends support to Kroger's assertion that the district court limited its findings to December 28, 1986 through December 30, 1989. This is the position taken by Kroger through its assertion that the 1991 audit revealed that Kroger's use of casual fluctuated over the years. (Def's Response to Pls.' 56.1 Facts at ¶ 88).

Furthermore, Central States conducted an audit subsequent to the outcome in *Kroger II* covering a period from January 1977 through December 30, 2000. (Pls.' 56.1 Facts as ¶ 92). That evidence, though relevant to Kroger's treatment of its employees hired during that period, was not available to the district court in the previous litigation. This provides more support to Kroger's argument that the status of its employees, hired between 1977 through 1993, excluding the prior litigated period, was not actually litigated or determined. We turn to the Court of Appeals' opinion in *Kroger II*. In *Kroger II*, the Court examined the district court's resolution of the ambiguity. The Court agreed with the district court that the term "casual" referred to "those employees that Kroger intended, when it hired them, to work for a short period of time. *Kroger II*, 226 F.3d at 912. (Prior to announcement of its four findings of fact, the district court also stated that the employees' status is determined as of the date of hire. (Tr. 8-B 1003).) The Court explained that the employees at issue were not casual, *inter alia*, because Kroger hired them with the expectation that they would become regular employees, and that they would work for long periods of time, eventually making the regular seniority list. *Kroger II*, 226 F.3d at 912. The district court's resolution of the ambiguity was based on Kroger's intent when it hired the

---

the section does not state that part-time employees may bid for permanent jobs. Thus, it remains a question as to whether part-time employees were authorized to bid for full-time employment. For purposes of Central States' motion that question must be resolved in favor of Kroger. O'Regan v. Arbitration Forums, Inc., 246 F.3d at 983.

employees. *Id.* at 913. In affirming the district court's conclusion that the employees were not "hired on a short term basis" or "employed from time to time," *Id.*, the Court of Appeals recognized that the finding was based on the fact that Kroger hired those employees with the intention that they would eventually become regular employees. *Id.* Thus, the issue *directly* determined by the district court was Kroger's intent when it hired employees between 1987 through 1989. Whether Kroger is liable for pension contributions on behalf of employees hired between 1977 through 1986 and 1989 through 1993 must be resolved by determining Kroger's intent when it hired these employees. That issue was not directly determined by the district court in the prior litigation. Finally, even assuming *arguendo*, that the first three elements have been satisfied, collateral estoppel would not apply to this action for failure of the fourth. Collateral estoppel applies only if a finding of fact or law was necessary and essential to an earlier judgment. *Frye v. United Steelworkers of America*, 767 F.2d 1216, 1220 (7th Cir. 1985) (citing *Wickham Contracting Co., Inc., v. Board of Education*, 715 F.2d 21, 28 (2nd Cir. 1983)). Thus, collateral estoppel attaches only to issues that had to be reached, not to issues that could have been reached, when the deciding court did not expressly state which one the judgment was based on. *See Frye*, 767 F.2d at 1220 (citing *Nasem v. Brown*, 595 F.2d 801, 804 (D.C. Cir. 1979)). The judgment in the prior litigation was for Kroger's liability for pension contributions on behalf of newly hired employees from December 28, 1986 through December 30, 1989. (Decision on Liability at 5). Only a determination of Kroger's intent from December 28, 1986 through December 30, 1989, and thus the status of the newly hired employees during that time period, was necessary to support the judgment of liability in the prior litigation. *See Jacobs*, 73 F.3d at 168 (stating that issue preclusion applies only to determinations that were necessary to support the judgment). Any determination as to Kroger's intent, and thus the status of the newly hired

employees, between the years 1977 through December 27, 1987 and 1990 through 1993 could not have been necessary and essential to a judgment of liability for pension contributions on behalf of employees hired between December 28, 1986 through December 30, 1989. Because the district court in the prior litigation did not expressly state that all newly hired employees after 1977 were casual and not probationary, issue preclusion attaches only to that issue which must have been decided, *Id.*, i.e., that the newly hired employees from December 28, 1986 through December 30, 1989 were casual and not probationary.

We have noted that a factual question exists as the whether the newly hired employees were treated differently from 1977 through 1993..[7] A change in circumstances between discrete and separate time periods is sufficient to overcome collateral estoppel. *See Joseph A. v. New Mexico Dept. of Human Services*, 28, F.3d 1056, 1059 (7th Cir. 1994)(holding that collateral estoppel did not apply because the circumstances surrounding the fee application before the court were distinct from those existing at the time of an earlier fee application). Furthermore, different outcomes involving different time periods are not necessarily inconsistent. *Rucker v. Chater*, 92 F.3d 492, 495 (7th Cir. 1996). Thus, for the foregoing reasons Kroger is not collaterally estopped from claiming that its newly hired employees between 1977 through 1986 and 1990 through 1993 were casual and not probationary.

However, we note that the definition of "casual" in the Master Agreement and "part-time" in the Local Supplement did not materially change from 1977 through 1993. (Plaintiff's 56.1 Facts at ¶ ¶ 35, 41). The Court of Appeals determined that the Master Agreement and the Local Supplement formed a single, unitary contract. *Kroger I*, 73 F.3d at 731; *Kroger II*, 226 F.3d at 901 (Plaintiff's 56.1 Fact at ¶ 21). The Court of Appeals found that the term "casual" as

---

[7] Though we noted one significant difference in the treatment of newly hired employees, the job bidding procedure, Kroger and Central States themselves dispute whether the treatment of the newly hired employees materially changed between 1976 and 1993. (Response to Plaintiff's 56.1 Facts at ¶ 85)

defined by section 2.3 of the Master Agreement and "part-time" as defined by the Local Supplement created an ambiguity in the CBA. *Id.* at 733. The Court of Appeals held that only if the employees were truly casual, and not probationary, was Kroger's reclassification permissible. *Id.* On remand, the district court determined, and the Court of Appeals affirmed, that the term "casual" referred to "those employees that Kroger intended, when it hired them, to work for a short period of time." *Kroger II*, 226 F.3d at 912. Finally, we note that the Court of Appeals held that Kroger and the Union could not redefine the term "casual" in derogation of the clear meaning contained in the CBA. *Id.* at 913-914. We find that Kroger is collaterally estopped from relitigating these issues. Thus, our resolution of the ambiguity, as in the prior litigation, turns on the determination of Kroger's intent at the time the employees in question were hired.

### Availability of Laches Defense

Central States further argues that Kroger is collaterally estopped from asserting laches as a defense. (Pls.' Summ. J. Br. at 8-9; Pls.' Reply Br. at 8). However, Central States' argument fails because Kroger did not raise, nor could it have raised, the defense of laches in the prior litigation. What Kroger did raise was the defense of estoppel. *Kroger II*, 226 F.3 at 914. In *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579 (7th Cir. 1999) the Seventh Circuit recited the four elements of estoppel in the context of an ERISA claim. *Coker*, 165 F.3d at 585. Those elements are: "(1) a knowing misrepresentation; (2) made in writing; (3) with reasonable reliance on that misrepresentation by the [asserting party]; (4) to [that party's] detriment." *Id.* The district court in *Kroger II* found that estoppel did not apply because Central States had not made a knowing misrepresentation. *Id.* The Court of Appeals affirmed, *Id.* at 915, but on other grounds that reliance by Kroger on any misrepresentation would have been unreasonable. *Id.*

17

Central States argues that because the Seventh Circuit, in *Teamsters & Employers Welfare v. Gorman Brothers Ready Mix*, 283 F.3d 877 (7th Cir. 2002), stated that "laches is thus a form of equitable estoppel rather that a thing apart" that Kroger is precluded from raising laches as a defense. (Pls.' Summ. J. Br. at 8 n.4). However, an examination of laches, as well as the *Gorman Brothers* opinion itself makes clear that Kroger is not estopped from asserting the defense. Laches applies when a "plaintiff has waited for an unreasonable length of time to assert his claim and the defendant has been prejudiced by the delay." *Horbach v. Kaczmarek*, 288 F.3d 969, 973 (7th Cir. 2002). It would appear then that laches requires only (1) unreasonable delay and (2) prejudice to the other party as a result of that delay. Estoppel, on the other hand, appears to require both a knowing misrepresentation and reasonable reliance on that misrepresentation. In *Kroger II*, Kroger argued that Central States misrepresented to Kroger that its reporting was accurate when Central States (1) sent monthly bills for fund contributions based on the information provided by Kroger and (2) accepted Kroger's monthly contributions. *Kroger II*, 226 F.3d at 914. Without deciding whether either of the claimed misrepresentations amounted to misrepresentations in fact, the Court of Appeals concluded that any reliance on these misrepresentations could not have been reasonable because Kroger was in a better position to know the truth that its practice did not comport with the CBA. *Kroger II*, 226 F.3d at 915. In this suit, Kroger argues laches on the grounds that Central States unreasonably delayed in bringing suit for contributions owed from 1977 to 1986. (Def.'s Summ. J. Br. at 13-14). Kroger points out that it could not have argued unreasonable delay in the previous litigation because Central States claim, filed in 1993, sought contributions only for the years between 1987-1989. (Def.'s Resp. Br. at 7). The present claim seeks contributions dating back to 1977 and thus, raised the issue of unreasonable delay. This alone would be sufficient to deny preclusive effect.

Furthermore, the defenses are different, in Kroger's view, because laches does not require a knowing misrepresentation on which the defendant has relied. (*Id.* at 8-9).

However, the decision in *Gorman Brothers* complicates the issue because the Court of Appeals stated, after a comparison of *laches* and estoppel, that "if we are right that *laches* and equitable estoppel are the same thing, it can't matter which term is used." *Gorman Brothers*, 283 F.3d at 882. In its discussion of *laches* as the "mirror image" of equitable estoppel, *Id.* at 881, the Court of Appeals stated that *laches* applies if "a plaintiff does something that reasonably induces the defendant to believe he won't be sued and the defendant's ability to defend himself against the plaintiff's suit is impaired as a result . . ." *Id.* at 882. Central States argues that the Court of Appeals decided that *laches* and equitable estoppel are the same defense. (Pls.' Reply Br. at 8). At one point the *Gorman Brothers* Court stated that "[s]ince *laches* and equitable estoppel are interchangeable-or, if not, since this is actually a case of the latter rather than the former . . .", *Gorman Brothers*, 283 F.3d at 882. From this language it would appear that the Court did not resolve the issue of whether *laches* and estoppel are the same. Then again, the Court later stated that "the fault that consists in being unreasonable in relying on a promise or other words (or conduct) of an opposing party is a defense in all estoppel cases, including all cases of *laches*, whether the conduct giving rise to the claim of estoppel or *laches* is intentional or accidental. *Id.* at 883-84 (internal citation omitted). Because delay, other than intentional delay, would be accidental, from this language it might appear that the Court concluded that reasonable reliance is an element of *laches*. However the reliance at issue in *laches* is the reliance on delay while the reliance at issue in estoppel is the reliance on a misrepresentation. We believe, therefore, that reliance on delay is really part and parcel to the detriment element of *laches*. *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666,674 (7th Cir. 1982) (stating that

*laches* is cognizable only if the defendant *acted* to his detriment because of the delay.) If a defendant does not relay in some way on the delay there can be no detriment.

In the first lawsuit Kroger claimed that Central States' misrepresentations lead it to believe that it was in conformance with the CBA. The difference in Kroger's claim in this lawsuit is, in essence, that Central States' delay in bringing this suit created a false sense of security in Kroger that it would not be sued and could continue its practices. (Def's Summ. J. Br. at 14-15). Thus, according to Kroger its detriment is twofold: (1) the length of time has prejudiced its ability to defend itself through lose of evidence and witnesses; and (2) it would have changed it practices earlier, thus reducing its liability, had it been sued earlier. (Def's Reply Br. at 13-15). This conclusion is not only consistent with pre-*Gorman Brothers* opinions that have not been overturned, *see Lake Caryonah Improv. Ass'n v. Pulte Home Corp.*, 903 F.2d 505, 509 (7th Cir. 1990) (stating that "[l]aches operates as a bar upon the assertion of a party's rights when that party has unreasonably delayed in asserting it rights so as to cause prejudice to the adverse party."); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999) (stating that *laches* requires "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising thereform."), as well a post-*Gorman Brothers* opinion, *see Horbach*, 288 F.3d at 973 (stating that *laches* applies when a "plaintiff has waited for an unreasonable length of time to assert his claim and the defendant has been prejudiced by the delay."), but also with the United States Supreme Court. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 127 (2002) (stating that the *laches* defense requires "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."). Furthermore, if unreasonable reliance is a defense to *laches*, it is probably because the party asserting the defense cannot be prejudiced by unreasonably relying

on the delay, or because some conduct by the asserting party caused the delay, resulting in the delay itself as not unreasonable. Kroger is not estopped from asserting the defense of *laches*.

## Stare Decisis

Finally, Central States argues that the doctrine of *stare decisis* bars Kroger's defenses. Central States argues that summary judgment is warranted because the facts in the case before this Court are indistinguishable from those of the prior litigation and thus, the doctrine *stare decisis* requires a decision in their favor. (Pls.' Summ. J. Br. at 9-10). First, we have already noted that the facts are not indistinguishable, that is, Kroger's intent between 1987-1989 is not necessarily conclusive of its intent between 1977-1986 and 1990-1993. Second, "stare decisis bars a different party from obtaining the overruling of a decision." *Bethesda Lutheran Homes & Services, Inc. v. Born*, 238 F.3d 853, 858 (7th Cir. 2001). The doctrine prevents a court from reexamining a recent decision unless a compelling reason exists to do so. *Id.*

Kroger has not argued that this Court should decline to follow the legal and factual conclusions of the prior litigation, (Def.'s Resp. Br. at 9-10), i.e., that the use of the terms "casual" and "part-time" create an ambiguity or that the status of employees is determined at the time of hire. Rather, Kroger argues that the facts of this case, specifically those facts relevant to determining the status of employees hired between 1977-1986 and 1990-1993, are different from the facts of the previous litigation, specifically those facts relevant to determining the status of employees hired between 1987-1989. (*Id.*) Therefore, because Kroger is not asking this Court to disregard the previous rulings of the Court of Appeals, *stare decisis* does not apply to the instant action.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Statute of Limitations

Kroger claims that Central States' lawsuit is barred, at least in part, by the statute of limitations. (Def's. Mem. at 5-13) ERISA itself does not contain a statute of limitations. *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 896 at 873 (7th Cir. 1997). However, the Trust Agreement provides that the Illinois Ten-Year Statute of Limitations on written contracts shall apply to actions to collect delinquent contributions. (Plaintiff Exhibit F to Rule 56.1(a)(3) Facts). Despite this language, Kroger argues that one of two other statutes of limitations should apply. (Def's. Mem. at 5-9) The first is the Illinois Five-Year Statute of Limitations applicable to Wage and Benefit Payment Actions. (Def's. Mem. at 5-7). The second is the statute of limitations applicable to ERISA debt collection proceedings pursuant to § 1451 of the Act. (Def's. Mem. at 7-9). We will address each argument in turn. However, we first address whether the adoption of a state statute of limitations is enforceable in the absence of a limitations period in the federal statute in question. Kroger correctly states that, in the absence of a statute of limitations in a federal statute, courts generally apply the most analogous state statute. *Gorman Brothers*, 283 F.3d at 880; *Central States, Southeast & Southwest Areas Pension Fund v. Jordan*, 873 F.2d 149, 152 (7th Cir. 1997); *Robbins v. Iowa Road Builders Co.*, 828 F.2d 1348, 1353 (8th Cir. 1987). Kroger puts forth that this Court should disregard the choice of law clause, specifically adopting the Illinois Ten-Year Statute of Limitations on written contracts, and undertake an examination of the most analogous state statute of limitations. (Def's. Reply Mem. at 2-3). It does so on the grounds that adopting a choice of Illinois state law is inappropriate when jurisdiction is based on a federal question and not diversity. (Def's. Reply Mem. at 3). Kroger cites the Eighth Circuit decision in *Robbins* and the Sixth Circuit decision in

*Central States, Southeast & Southwest Areas Pension Fund v. Kraftco*, 799 F.2d 1098 to support

its proposition. (Def's. Reply Mem. at 3). *Kraftco* is inapposite because, while the trust

agreement did state that it was subject to Illinois law, it did not specifically incorporate the

Illinois Ten-Year Statute of Limitations for written contracts. *Kraftco*, 799 F.2d at 1102. *Robbins*

is more persuasive as the trust agreement specified that the Illinois Ten-Year statute would

apply. *Robbins*, 828 F.2d at 1352. Central States cites responds by citing the Seventh Circuits

decision in *Doe v. Blue Cross*. (Pls.' Resp. Br. at 2). In *Doe v. Blue Cross*, the Seventh Circuit

upheld a contractual provision shortening the statute of limitations. *Doe v. Blue Cross*, 112 F.3d

at 872-875. The fact that the Seventh Circuit upheld the limiting agreement supports Central

States position that parties may adopt a statute of limitations. However, the opinion is not

directly on point as the trust agreement did not specifically adopt a state law, but rather,

contained a clause shortening the state limitations period. Reviewing other circuit decisions, we

note that the Tenth Circuit refused to apply an Illinois state statute of limitations based on a

choice of law clause, but did so on the grounds that the clause did not specifically incorporate

the Illinois statute of limitations. 770 F.2d 141, 142-43 (10th Cir. 1985). We also note that in

*Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 (3rd Cir. 1992), a case specifically cited by Kroger in

support of a later argument, held that "[c]hoice of law provisions in contracts do not apply to

statutes of limitations, *unless* the reference is specific", *Id.* (emphasis added), as is the case

before this Court. Finally we come to *Wang Laboratories, Inc. v. Kagan*, 990 F.2d 1126 (9th Cir.

1993), a case directly on point. In *Wang*, the Ninth Circuit stated that "[w]here a choice of law is

made by an ERISA contract, it should be followed, if not unreasonable or fundamentally unfair."

*Id.* at 1128-1129. In holding that the choice of law clause was not unreasonable or

fundamentally unfair, the Court cited the Supreme Court's opinion in *Carnival Cruise Lines v.*

*Shute* 499 U.S. 585 (1991), upholding a choice of forum clause because it would conserve judicial resources and ultimately benefit ticket purchasers. *Id.* at 1527. The Ninth Circuit concluded that upholding a statute of limitations clause would not only be less burdensome than a choice of forum clause, but would be beneficial to the parties by allowing them to conserve costs of not having to account for the uncertainty surrounding the possibility that the statute of limitations would vary with each forum state. *Wang*, 990 F.2d at 1129.

Determining whether the Seventh Circuit would uphold a limitations clause adopting a state statute of limitations in an ERISA action is not necessary because we hold that the Illinois ten-year statute of limitations for written contracts is applicable under federal choice of law doctrine. However, we believe that the opinion in *Doe v. Blue Cross*, holding that a clause shortening the statute of limitations is permissible so long as it is not unreasonable because it is consistent with the principle of party autonomy underlying contracts, *Doe v. Blue Cross*, 112 F.2d at 874, reveals that the Seventh Circuit would follow the opinion in *Wang* and uphold the choice of law clause so long as it was not unreasonable to do so. Furthermore, based on the Seventh Circuit decisions in *Jenkins v. Local 705 Int'l Bhd. Of Teamsters Pension Fund*, 713 F.2d 247 (7th Cir. 1983), and *Central States v. Jordan*, 873 F.2d 149, 154 (7th Cir. 1989), applying the Illinois ten-year statute of limitations for written contracts to ERISA actions, we believe that it would find the incorporation of that statute of limitations to be reasonable.

Assuming that the statute of limitations specifically adopted by the trust agreement is inapplicable, we turn the Kroger's claim that another statute of limitations, other than the Illinois ten-year statute of limitations for written contracts is applicable. The Seventh Circuit has applied the Illinois ten-year statute of limitations on written contracts to enforcement of trust agreements pursuant to ERISA. In *Jenkins v. Local 705 Int'l Bhd. Of Teamsters Pension Fund*,

713 F.2d 247 (7th Cir. 1983), the Court held that an action brought by a beneficiary to enforce a trust agreement was an action to enforce a written contract. *Id* at 253. In *Central States v. Jordan*, 873 F.2d 149, 154 (7th Cir. 1989) the Court applied the ten-year statute of limitations holding that an action brought by the trustee of a pension fund to collect delinquent employer contributions was an action upon a written contract. *Id.* Other Circuits have found it proper to apply the state statute of limitations applicable to written contracts when a pension files an ERISA claim for delinquent contributions. If fact, even the cases cited by Kroger as support for its argument that the specific trust agreement provision should not be enforced ultimately applied the state statute of limitations for written contracts. *See Robbins*, 828 F.2d at 1353-54 (holding that "the most appropriate characterization of trustee actions under ERISA to collect delinquent contributions for statute of limitations purposes is as actions for breach of written contracts."); *Kraftco*, 799 F.2d at 1107 (holding that the Tennessee statute of limitations for written contracts applied to Central States ERISA claims.) The Sixth Circuit relied on Seventh Circuit's opinion in *Jenkins, Id.* at 1105, the Second Circuit opinion *Miles v. New York State Teamsters Convergence Pension & Retirement Fund Employee Pension Benefit Plan*, 698 F.2d 593 (2nd Cir. 1983), as well as several district court decisions. *Id.* Given the weight of authority, and specifically the Seventh Circuit's binding decision in *Jordan*, we hold that this action, an action by a pension fund to collect delinquent contributions owed to it under collective bargaining and trust agreements, is an action based on a written contract. As discussed in *Jordan*, the Illinois ten-year statute of limitations for written contracts is the most analogous state statute.

We decline to seek a better fit and instead choose to follow the law laid down by the Court of Appeals in *Jordan*. However, even assuming, as Kroger suggests, that the dicta in *Gorman Brothers* authorizes this Court to consider other possible statutes of limitations, we

would still hold that the ten-year statute of limitations is the most analogous. Kroger argues that the Illinois Five-Year Statute of Limitations applicable to Wage and Benefit Payment Actions is the most analogous state statute. In short, Kroger argues that the statute of limitations applied to Illinois Wage Payment and Collections Act, (820 ILCS § 115/2), which governs claims to collect unpaid wages and other compensation including contributions to pension funds should applied to ERISA actions. (Def.'s Summ. J. Br. at 6) In *Clark v. Western Union Telegraph Co.*, 490 N.E. 2d 36 (Ill. App. Ct. 1986) the Illinois Appellate Court applied a five-year statute of limitations to claims filed under the IWPCA.. *Id.* at 37-38. Central States argues that the court in *Clark* applied the five-year limitations period for oral contracts because the contract that gave rise to the IWPCA claim was not written, and thus, actually supports Central States position that the ten-year limitations period is applicable here because the contract giving rise to the ERISA claim is written. (Pls.' Resp. Br. at 3). Kroger on the other hand, claims that as to the IWPCA count, the court applied the Illinois "catch-all" five-year statute of limitations. (Def.'s Reply Br. at 3-4). While statute applied covers oral contracts and contains a "catch-all" provision. *See* 735 ILCS § 5/13-205. It is not clear from the opinion for which reason the court thought that statute applied. What is clear, however, is that the IWPCA does not provide a statute of limitations and the Illinois Supreme Court has not adopted the five-year period applied by the Illinois appellate court. What is also clear is that the Seventh Circuit specifically cited *Clark* in its *Jordan* opinion but applied the Illinois ten-year statute of limitations in an ERISA claim arising out of a written contract. *Jordan*, 873 F.3d at 153. That fact alone persuades us that the Seventh Circuit has chosen the Illinois ten-year statute of limitations for written contracts as the most analogous state statute.

Kroger points out that the Third Circuit has adopted the Pennsylvania Wage Payment and

Collection Law's three-year statute of limitations for ERISA actions to collect delinquent employer contributions. *Gluck*, 960 F.2d at 1181. However, one circuit specifically cited by Kroger to support another proposition has adopted the state statute of limitations for written contracts to claims for delinquent contributions under ERISA. *Krafto*, 799 F.2d at 1105-07 (applying the Tennessee six-year limitation period for actions on written contracts).

Even more telling is the *Robbins* case, also cited by Kroger. In *Robbins*, the Sixth Circuit specifically rejected the Iowa statute of limitations under the Wage Payment Collection Law, *Robbins*, 828 F.2d at 1353-54, and adopted the Iowa statute of limitations for breach of written contracts to an action to collect delinquent employer contributions under ERISA. *Id.* at 1354. The Seventh Circuit has implicitly done the same in *Jordan* when it recognized the Illinois decision in *Clark*, *Jordan*, 873 F.2d at 152, and the Eighth Circuits decision in *Robbins*, *Id.* at 154, in holding that the Illinois statute of limitations for breach of written contracts applies to ERISA actions to collect delinquent employer contributions. *Id.* The Second Circuit has done so as well. *Miles*, 698 F.2d at 598 (applying the New York statute of limitations for breach of written contracts). Given this weight of authority, and specifically the Seventh Circuits decision in Jordan, we hold that the Illinois Ten-Year Statute of Limitations for actions upon written contracts applies to this action.

Having decided that *Jordan* requires the application of the Illinois breach of written contract statute of limitations to claims for delinquent contributions under ERISA it is unnecessary for us to decide whether the statute of limitations contained in ERISA's debt collection provision, 29 U.S.C. § 1451(f), is more analogous. However, we note it seems unlikely that Congress intended this provision to apply to ERISA actions for delinquent employer contributions but forgot to indicate that intent in the statute. Regardless, we do not

27

believe that Judge Easterbrook's tentative belief that federal law supplies the statute of limitations, *see Gorman Brothers*, 283 F.3d at 888 (Easterbrook, J., dissenting) (stating "at least tentatively I am more attracted to the position that federal supplies the period of limitations"), is enough for this Court to ignore the majority decision in *Jordan*.

Having decided that the statute of limitations is ten years, we must now determine when that time began to run. The statute of limitations began to run when, with the exercise of reasonable diligence, Central States would have become aware of Kroger's failure to pay. *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 343 (D.C. Cir. 1991). Kroger claims that its Mark IV Reports, sent to the Fund continuously since 1974-1975, should have put the Fund on notice that its treatment of the employees. (Def's Summ. J. Br at 6-11).[8] However, because we hold that the Fund did not have actual knowledge of Kroger's failure to pay until the audit of 1991, and that a question of fact exists as to when Central State's should have known of Kroger's failure to pay we must deny Kroger's request for summary judgment on the statute of limitations grounds. We note that there is also a question of fact as to when Central States began receiving the Mark IV Reports. While Kroger claims that it has sent Mark IV Reports continuously since 1974, it is undisputed that Kroger was able to produce only those Mark IV Reports sent since 1987. (Def's Response to Pls. Add. Facts at ¶ 8). This alone is sufficient to create a question of material fact.

Kroger states that the Mark IV Reports revealed a gap between the date of hire and the first date of contributions. (Def's Reply Br. at 8-9). According to Kroger, this gap provided Central States with notice that it was not properly contributing on behalf of the newly hired employees. (*Id.*). However, Central States points out that if the gap applied to an employee that

---

[8] We not that the statute of limitations was tolled as of June 18, 1993 as a result of the Tolling Agreement signed by Central States and Kroger. (Plaintiff's Exhibit K at 69-70).

truly worked as a casual, i.e. one day per month, or in some capacity otherwise not covered by the collective bargaining agreement, before being placed on the regular seniority list, then the existence of a gap would have been proper because that employee would not have been entitled to receive benefits. (Pl's Response Br. at 6). Thus, the existence of a gap was not enough to put Central States on notice that Kroger was failing to make contributions on behalf of employees for which it was required to do so. At the very least, there is a question of fact as to whether the gap was enough to put Central States on notice

Kroger also claims that an earlier audit of it Indianapolis facility should have put Central States on notice. (Def's Reply Br. at 9). However, Central States points out that, while all Kroger facilities were under the same Master Agreement, the Indianapolis facility was under a different Local Supplement. (Pl's Response Br. at 7). The fact that one facility, located in a different state, may have treated employees improperly does not necessarily mean that another facility, located in another state, may be doing the same.

Kroger's claim that Central States should have known of the possibility of improper reporting had they looked into the ambiguous term "part-time" is equally unavailing. (Def's Summ. J. Br at 10). As Central States explains, and the Seventh Circuit opinion in the prior litigation supports, neither Kroger nor Central States believed the term was ambiguous. (Pl's Response Br. at 7); *Kroger I*, 73 F.3d at 732 (stating that neither party argues that the CBA was ambiguous but in fact "agree[d] that it [was] unambiguous"). Rather, it was the Court of Appeals that determined there was an ambiguity. *Id.* at 731. It is unreasonable to believe that Central States should have inquired into an ambiguity it did not think existed.

Finally, Kroger argues that because a one time union official became a trustee of Central States it should be imputed that Central States was aware of Kroger's treatment of new hires.

29

(Def's Summ. J. Br. at 12). Kroger cites to Judge Marshall's decision in *Napoli v. Board of Trustees of Thornton Community College*, No. 83-C-1894, 1986 U.S. Cist. LEXIS 25152 at *9 (N.C. Ill. May 22, 1986). First, we note that this suit did not involve a pension fund trustee. More importantly, the claim in which the district court considered the knowledge of individual trustees was only in regards to a claim that directly challenged the role of those trustees in the Board's decision to terminate the plaintiff. *Id.* at *8-9. Furthermore, applying agency law the court stated that the only knowledge that could have been imputed to the corporation was knowledge acquired by an agent acting in that capacity. *Id.* at 10. There is no dispute that any knowledge the trustee acquired was acquired in his role as a union official, not as a trustee.

## Laches

Finally, Kroger argues that Central States claim is barred by *laches*. *Laches* applies when a "plaintiff has waited for an unreasonable length of time to assert his claim and the defendant has been prejudiced by the delay." *Horbach v. Kaczmarek*, 288 F.3d 969, 973 (7th Cir. 2002). "The doctrine is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the **detriment** of the opposing party." *Id.* As a threshold matter, there is debate whether *laches* applies to ERISA actions at all. The Seventh Circuit noted in *Gorman Brothers* that some courts have invoked a presumption against the use of *laches*. *Gorman Brothers*, 283 F.3d at 881. Judge Zagel, citing the Seventh Circuit's opinion in *Bennet v. Tucker*, 827 F.2d 63, 69 (7th Cir. 1999), expressed doubt as to its applicability. *Central States v. Spitzer Buick*, 99 C 1134 (N.D. Ill. 1999). However, like many courts, he declined to answer the question. Because we hold that Kroger has not met its burden of proving the first element of *laches* we shall do the same. We have already stated that there is a question

30

of fact as to when Central States knew or should have known of Kroger's failure to pay contributions. We do know that Central States had actual knowledge after it conducted an audit in 1991. The first suit was filed in 1993 with an understanding that no other audits would be conducted pending the outcome of that suit. Thus, the only ascertainable delay was less than two years, which is not unreasonable. Therefore, we are unable to hold, as a matter of law, that Central States claims are barred by *laches*.

## CONCLUSION

For the foregoing reasons, Central States motion for summary judgment and Kroger's cross motion for summary judgment are denied. [#30-1, #32-1]

SO ORDERED          ENTERED: 3/28/03

Ronald A. Guzman
United States Judge