## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2680 | **DATE** | 10/28/2004 |
| **CASE TITLE** | Central States SE & SW, et al vs. The Kroger Co. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The Court finds for plaintiff and against the defendant and enters judgment as follows: (1) contributions in the amount of $554,088.00; (2) double interest in the amount of $1,792,l89.08 through June 2003; plaintiffs are given 14 days to file an itemization of interest accruing from July 2003 to the date of this judgment, which is to be added to the interest award; (3) audit fees and costs in the amount of $13,838.14; (4) post-judgment interest to accrue at the prime rate in accordance with the Trust Agreement; and (5) attorney's fees and costs - plaintiff is instructed to pursue its request for attorneys fees and costs in accordance with our Local Rule 54. Enter Memorandum Opinion and Order

*Ronald A. Guzman*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | NOV 0 1 2004 | 56 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | JXM | |
| ☞ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 10/28/2004 | |
| | | | date mailed notice | |
| SRB | courtroom deputy's initials | | SB | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Central States, Southeast And )
Southwest Areas Pension Fund, and )
Howard McDougall, trustee, )
                        )      01 C 2680
                        )
        Plaintiff,        )      Judge Ronald A. Guzmán
                        )
    v.                     )
                        )
The Kroger Co. an Ohio Corporation, )
                        )
        Defendant.

DOCKETED

NOV 1 2004

## MEMORANDUM OPINION AND ORDER

This case presents the second federal district court complaint filed by Central States, Southeast and Southwest Areas Pension Fund ("Central States"or "the Fund") to collect unpaid pension fund contributions from The Kroger Co. ("Kroger") on behalf of certain employees at Kroger's Atlanta warehouse facility. The first complaint, filed in 1993, spawned two Seventh Circuit opinions. *Central States, Southeast & Southwest Areas Pension Fund v. Kroger Co.*, 73 F.3d 727 (7th Cir. 1996) ("*Kroger I*"); and *Central States, Southeast & Southwest Areas Pension Fund v. Kroger Co.*, 226 F.3d 903 (7th Cir. 2000) ("*Kroger II*"). An explanation of the facts surrounding those opinions is necessary to understand the present action.

Kroger is a national grocery store chain that operates a distribution and warehouse center in Atlanta. *Kroger I*, 73 F.3d at 729. Local 528 of the International Brotherhood of Teamsters represents the warehouse employees and truck drivers who work at the Atlanta facility. *Id.* The employment relationship is governed by a collective bargaining agreement ("CBA"). *Id.* The CBA consists of two parts: a Master Agreement negotiated by Kroger and the Teamsters which covers several facilities nationwide including the Atlanta facility; and a Local Supplement negotiated by the Atlanta facility and Local 528 which applies to the Atlanta facility alone. *Id.*

The Master Agreement of the CBA provided for three types of employees: "regular" employees; "probationary" employees; and "casual" employees. *Id.* Section 2.2 of the Master Agreement defined "probationary" employees as new employees who work on a trial basis for thirty days not to exceed sixty calendar days, who may be discharged at the discretion of the employer.[1] *Id.* After the trial period the employee "shall be placed on the regular seniority list." *Id.* The Master Agreement defined "casual" employees as those "hired on a short-term basis" as may be employed from time to time. *Id.* Casual employees were permitted only at facilities with a past practice of hiring casuals and the total number hired could not exceed ten percent of the work force. *Id.* Under the Master Agreement, Kroger was required to make pension contributions on behalf of all employees who had worked for thirty days and had been placed on the regular seniority list. *Id.* As such, Kroger was obligated to make pension contributions on behalf of probationary employees that had completed the trial period but not on behalf of casual

---

[1] The Master Agreement for the years 1976 through 1979 defined the trial period as thirty days of work.

employees. *Id.*

The Local Supplement used different terms to describe employees at the Atlanta facility. *Id.* The Local Supplement referred to "full-time" employees and "part-time" employees. Neither term was defined. *Id.* However, the following characteristics regarding the term "part-time" emerged from the Local Supplement: (1) part-time employees were permitted to accrue seniority "only among other part-time employees"; and (2) there were certain job-bidding procedures pertaining to part-time employees.[2] *Id.*

Prior to 1977, Kroger designated all newly-hired employees at the Atlanta facility as part-time probationary employees. *Id.* In 1977 Kroger stopped paying contributions to the Fund for these newly-hired part-time employees who had completed the probationary period and/or changed the designation of newly-hired employees to casual *Id.* Many of those casual employees remained with Kroger for long periods of time and eventually became regular employees. *Id.* Kroger began making pension contributions on behalf of these newly-hired part-time employees only when they were placed on the regular full-time employee list. *Id.* However, Kroger did not make pension contributions on behalf of those employees as long as they remained part-time, a period that could last several months. *Id.*

In 1991, Central States conducted an audit of the Atlanta facility's employment records covering the period from December 28, 1986 through December 30, 1989 and determined that

---

[2] In 1985, the Local Supplement required "part-time" employees to bid on available permanent positions.

the employees designated as casuals were, in fact, probationary employees. *Kroger I*, 73, F.3d at 729. Central States then brought the first action on June 18, 1993 under 29 U.S.C. §§ 1132 and 1145 claiming that Kroger owed pension contributions on behalf of those employees from the day following their thirtieth day of work. *Id.* at 729-30. Kroger defended on the grounds that no obligation to pay pension contributions existed until the employees were placed on the regular seniority list because they remained casuals until that time. *Id.* at 730. Both parties moved for summary judgment. *Id.*

The district court granted summary judgment in favor of Kroger. *Id.* The crux of that decision was the interpretation of the term "part-time" employee in the Local Supplement. *Id.* The district court acknowledged that the Master Agreement required Kroger to contribute on behalf of full-time and part-time regular employees. *Id.* The district court also acknowledged the fixed meaning of the terms "full-time" and "part-time" as regular employees that work a forty-hour week and regular employees that work less than forty hours. *Id.* Nonetheless, the district court interpreted the term "part-time" in the Local Supplement as unambiguously describing the same employees defined as "casual" in the Master Agreement. *Id.*

On January 10, 1996, the Seventh Circuit reversed the district court in *Kroger I. Id.* at 733. The Seventh Circuit found that, in order to avoid ambiguity in the term "part-time," the district court read the CBA as a combination of two independent agreements. *Id.* at 731. The Seventh Circuit rejected the district court's conclusion and held that the two agreements formed a

single, unitary contract. *Id.* The Seventh Circuit held that the term "part-time" was ambiguous because the parties to the agreement suggested different yet reasonable interpretations. *Id.* at 732. The Court explained that the term could refer to regular employees who worked less than a regular work week or to casual employees. *Id.* As such, it was for the trier of fact to resolve the question of interpretation. *Id.* at 733. Finally, the Court stated that "only if the employees in question were truly casual, and not probationary, [as defined by the CBA], was Kroger's reclassification of the Atlanta employees permissible."

The district court, therefore, was left to decide two issues on remand: (1) Whether the parties intended "part-time" to mean "casual", and, if so (2), whether "part-timers" actually were "casuals"as defined in the CBA. Only if the answer to both of those questions was yes, would Kroger win. What Judge Grady found on remand was that the answer to question number one was, "yes"; that is, the parties to the Local Supplement intended the term "part-time" in the local agreement to mean the same as "casual" in the CBA. However, the answer to question number two was "no", that is, the part-timers in the local agreement did not fit the definition of "casual" in the CBA. Rather, the part-timers in the Local Supplement were nothing more than part-time probationary and part-time regular employees as defined in the CBA. Therefore, Kroger did owe contributions for the hours they worked.

Kroger's appeal resulted in the Seventh Circuit's *Kroger II* opinion. On September 15, 2000, the Seventh Circuit affirmed the findings and ruling of the district court. *Central States,*

*Southeast & Southwest Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 915 (7th Cir. 2000)

("*Kroger II*") at 915. The court of appeals agreed that the term "casual" referred to those

employees Kroger intended, *when it hired them*, to work for a short period of time and not those

employees expected, "in the normal course," to work for long periods of time. *Id.* at 912. The

court then reviewed the application of that definition to the facts before the district court and

found that there was sufficient evidence to support the district court's finding that the employees

in question were not casual employees and thus, the finding was not clear error. *Id.* at 913. In

particular, the court agreed that "[t]he ability to bid on permanent jobs [was] entirely at odds with

the concept of casual employment . . . ." *Id.* at 913 (internal quotation omitted). Because it had

previously held that Kroger's reclassification of its employees would be permissible only if the

employees in question were truly casual, *Kroger II*, 226 F.3d at 912 (citing *Kroger I*, 73 F.3d at

733), the court of appeals affirmed the district court's ruling on liability. *Kroger II*, 226 F.3d at

912.


Central States then filed this action against Kroger under 29 U.S.C. §§ 1132 and 1145 for

unpaid pension contributions on behalf of all newly-hired Atlanta facility employees from 1977

through May 24, 1993, except those hired during previously litigated time period of December

28, 1986 through December 30, 1989. (Compl.¶ 30). Given the prior litigation, the only issues

before this court are whether the part-timers/casuals hired by Kroger during the relevant time

period are really part-time probationary and part-time regular employees as defined in the CBA

and, if so, whether any of Kroger's affirmative defenses this time around will save it from

liability.

## Discussion

The most convincing evidence in the trial on the question of the true status of Kroger's newly-hired employees came from the four witnesses called by the Fund to testify as to their experiences as Kroger employees. In total these witnesses had some eighty years of experience as employees at the Atlanta warehouse. Their testimony was surprisingly consistent as they described what they experienced during their hiring process and what they observed as they worked anywhere from sixteen to twenty two years at the warehouse.

John Chandler testified that he worked for Kroger at Atlanta, Georgia from September 1978 to 1998. He recalls that he heard about the job from friends who urged him to apply. He was looking for full-time work. He was interviewed by Jack Hogan who informed him that if he did a good job, in thirty days he would go to part-time worker and then to full-time work if he was offered a bid. It is interesting to note that he was not informed that his move to full time work was conditioned on whether or not there was work available. He was never told that he would be either temporary or casual. He was told that he would start part-time and that his hours could not be guaranteed, but that realistically he would work at least thirty two hours per week and up to more than forty hours per week. In fact, his experience was that he did work at least thirty two hours a week and often more than forty hours per week as a part-time worker. He received three training days and was told that he had to fill a quota that was measured in pounds moved per hour or per workday. He indicated that anyone who failed to meet this quota would

be disciplined or terminated. He said that he had set days off and that his supervisor would post the hours he was to work. He indicated that he was not allowed to refuse to work. He became full-time in April of 1979 (approximately six months after being hired) by signing a bid sheet. Bids for full-time work were offered by seniority to the part-time workers. Mr. Chandler identified a seniority roster of April 27, 1979 with his name on the last page, which he recognized as the seniority list for part-time workers. He indicated that to his knowledge all new hires were labeled "part-time". No one was ever hired as a full-time worker. All full-time workers were previously part-time workers. He identified Plaintiff's Exhibit 79 as what appear to be pages out of their contract. Page two indicates that part-time workers will be separated if they fail to qualify for full-time bids. Mr. Chandler indicated that his duties were the same after he became a full-time worker as they were when he was a part-time worker. There were always part-time workers at the Kroger plant while he worked there. Aside from one layoff of part-time workers in the 1980s, there was always work available for part-time employees at the Kroger plant.

On cross-examination Mr. Chandler identified Plaintiff's Exhibit 15 as his application for part-time work with Kroger. The last page indicates that he would be a "casual" worker. However, the last page of the application was not filled out by him. His signature appears on the third page bottom. He filled out only the first three pages. He was never shown the last page of his application as embodied in Plaintiff's Exhibit 15. As far as he is concerned, he was hired as a part-time, not a casual, worker. He also testified that other employees hired at the same time as he never became full-time regular workers.

Ken Bacheler testified he began working for Kroger's Atlanta warehouse in September 1977 and worked there for twenty- two years. He also was advised of the job opportunity at Kroger by a friend who was already working there. Mr. Bacheler also filled out an application and was interviewed by Jack Hogan. At his interview, Mr. Bacheler was told that he would be working part-time and would not be guaranteed more than thirty hours per week, would probably get as many as fifty hours per week. He was never told he would be a casual employee. As an order clerk, Mr. Bacheler's performance quota was one 125 pieces per hour. If he failed to meet this quota he would be progressively disciplined and could be fired. Upon being hired he was trained on the job by a full-time worker. He testified he would be told a day ahead of time when to come in for work and he did not have the option to refuse. He averaged fifty to fifty-five hours per week as a part-time employee. He became a full time worker in January of 1978 by bidding on a full-time opening. Senior part-time workers were given the option of bidding on full-time jobs. Mr. Bacheler testified that he was not required to bid on the full-time jobs.

While he was working at the warehouse there were always part-time workers there - every day. According to him, all full time workers began as part-time workers after the contract of 1976 and this never changed while he was there. He was told that in order to become full-time he would just have to wait for a full-time position to open up. There were others hired at the same time as he who never became full-time employees. Initially, as a part-timer, he went through a thirty day probationary period. Then, when he became a full-time worker he was given three weeks to "qualify"- to show he could do the job. When shown Plaintiff's Exhibit 12, an authorization for change of status, he indicated that he never saw it and he did not fill it out.

Page 9 of 28

However, this form does show his old classification as "casual."

Reginald Davis also testified that he was employed at the Kroger warehouse in Atlanta. He was hired in November of 1982 and quit in 1998. Like the previous two witnesses he was told about the job openings at the Kroger warehouse by a friend who was already a full-time worker there. At his interview, Davis told the interviewer that he was looking for full-time work. In response, he was told that he would start as part-time and when a bid became available he could become a full-time worker. He also had a quota which required him to do 210 cases per hour to keep his job. When shown Defendant's Exhibit 83, which he admits bears his signature, and which states that there is a good possibility that the job will be terminated in April of 1983, he claims he does not recall signing it. He says he was never told this, even though the document bears his signature. He was never told that he was a casual worker. He was told that once a full-time job became available it would go to the most senior part-time worker who qualified. He also went through a probationary period, probably thirty days. If he did not meet his quota during those first thirty days, it was his understanding he would be terminated. He worked at several jobs in the warehouse both before and after becoming a full-time worker. There were always certain days when he had to be at work and, sometimes, he would be called on other days to come in also. He was required to be available when called upon to work. He had three full days of training by a full-time worker and worked thirty to forty hours per week as a part-time worker.

Once he became a full-time worker he was, on occasion, put in charge of training others

who were new employees. He was told that the company wanted the new employees to remain employed there. Davis trained approximately fifteen to twenty new employees commencing sometime in 1988. He never knew of anyone hired by Kroger who did not have to start as a part-time worker. He worked as a part-time worker for over year before he signed a bid for full-time work as the senior worker on the part-time list. On the last page of his employment application, which bears his signature, it describes him as casual/spot labor. (Pltf's Exhibit 18) He, however, does not recall ever seeing this description and it would surprise him if that was his status when he was hired. He does not recall any layoffs while he worked there. While there he was never referred to as a casual worker but was always referred to as part-time. The new employees he trained were also referred to as part-time employees.

Also testifying for the plaintiff was Bennie Harden. Mr. Harden worked at Kroger's Atlanta warehouse from December 20, 1977 to April 4, 1999. After being told by a friend of the opportunities at Kroger, he filled an application and was interviewed by Jack Hogan. He testified that he told Mr. Hogan he needed a job to take care of his family. Hogan never told him the job was temporary and he never heard the word "casual." He was told he would have a thirty-day probationary period. Everyday his supervisor would tell him what to do the next day. He was told he would be trained for three days and that he would have a piece count or quota that he had to meet or he would be fired. His quota was 160 pieces per hour. His supervisor, Mr. Mumford, told him that if he did not make the count he would no longer be working for Kroger. He was trained for three days by a full-time worker. After becoming full-time he, on Mr. Mumford's orders, trained two or three new workers. He was told that if he was successful after thirty days

he would be classified as part-time and then through a bidding process he could become full-time. The bidding process was such that once a job was posted on the board he could sign and if he had the highest seniority he would get the full-time job. After becoming part-time he was given certain days to work, certain days off and certain days on call. He averaged forty-five to fifty-five hours of work per week from his first day of work. This did not change. If you were unavailable to work on the "call" days your chances of being a Kroger employee for very long were slim. He saw this happen to others.

On March 6, 1978, he became a full-time worker by bidding on a full-time job opening. This was his third attempt to bid on a full time job. On his previous two attempts, workers with more seniority were awarded the full-time jobs. Only when he became the most senior part-time worker was he finally awarded the full-time bid. All full-time employees were guaranteed forty hours of work per week. When first hired as a part-time worker, he was not guaranteed forty hours of work per week. Until he became a full-time worker he was not on the regular worker list.

The evidence from these workers is sufficient to establish that Kroger's intent at the time it hired all of its part-time, so-called "casual" employees, was not for them to work a short period of time or "from time to time," but rather for them to become permanent, full-time workers available to Kroger for its regular and customary day-to-day needs. Indeed, they were expected to be available on a regular basis even while working "part-time." Often these part-time workers worked forty hours per week or more. Approximately 10 to 12 percent of the hours worked in the

warehouse were overtime hours. This means that there was regularly more than sufficient work to occupy Kroger's regular full time work force. These workers were not hired for any specific short-term goal, or to meet any short-term requirements or seasonal fluctuations. They were not "spot" laborers. The need for them was permanent.

Furthermore, from the moment they were hired, these workers were given a path to take that, if successfully completed, would result in full-time permanent work. This was the intent and goal of hiring these workers, not that they be intermittent, short-term supplements to Kroger's regular work force. Three of these workers testified that throughout their tenure at Kroger (spanning some twenty two years) all full time permanent employees they were aware of were initially hired as "part-time" workers. If Kroger truly intended all of these new hires to be short-term, then Kroger did not intend to hire any regular permanent employees throughout the entire twenty-year period that these men worked at the warehouse. Such a conclusion is absurd and belied by the fact that Kroger continued to add to its permanent, full-time force the very men it now claims were hired for short-term, non permanent work, and that it did so systematically relying on seniority and performance, not because of some unexpected occurrence or circumstance. It was, in short, planned this way from the very inception of the employment. In fact, it appears that the only part-time, casual workers hired by Kroger during this period of time that did not end up as full-time regular workers were those who failed to meet Kroger's proficiency standards, were unavailable when called upon for extra work, or were otherwise deemed unfit by Kroger. Clearly, the intent of the Local Supplement was to circumvent the need to pay contributions into the fund after a mere thirty to sixty days of employment as required in

the CBA by redefining the term "casual" in derogation of the meaning contained in the CBA.[3] The Fund has met its burden of establishing that the workers denominated as part-time were regular, not casual, workers and as such subject to the contributions requirement of the CBA.

Kroger also asserts that the Fund's claim is barred by the statute of limitations. We have previously determined that the Illinois ten-year statute of limitations for written contracts is the most analogous state statute of limitations for this case. *Central States Pension Fund vs. Kroger Co.*, No. 01 C 2680, 2003 WL 1720023 at 12 (N. D. Illinois, Mar. 31, 2003). The fund did not have actual knowledge of Kroger's failure to pay until the audit of 1991. *Id.* at 12. The issue, then, is when should the Fund have known of the existence of its claim. The statute of limitations began to run only when, with the exercise of reasonable diligence, The Fund would have become aware of Kroger's failure to pay. *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336 at 343 (D.C. Cir. 1991). The parties have agreed that the running of the limitations period is tolled from June 18, 1993 to April 16, 2001, the date this case was filed. Going back ten years from June 18, 1993 takes us to June 18, 1983. Therefore, only if Kroger should have known of the existence of its cause of action sometime before June 18, 1983 has the ten year statute of limitations been violated.

Kroger contends that defendant had the facts necessary to deduce what Kroger was doing

---

[3] The fact that the progression from part-time to full-time work was based strictly on seniority, is contrary to the concept of a casual worker. Since casual workers are short term and intermittent there is less need for a formal system of seniority for such workers.

long before June of 1983 and, therefore, should have known that Kroger was failing to pay contributions. According to Kroger, it sent a report, known as a "Mark IV" report and a "206 Form"to the Fund every month in order to comply with the reporting requirements. If the Fund had only compared the two reports it would have seen that there was a gap of time for any given employee between the initial date of hiring reflected on the Mark IV and the initial pension activation date for that employee reported on the 206 Form. Further, the Fund would have seen that this period of time was too long to be explained by the thirty day probation period allowed in the CBA. Thus the Fund should have known from the time it began receiving Kroger's Mark IV reports that a cause of action existed. According to Kroger it began sending the Mark IV reports in 1974 or 1975.

For support of its contention that the Mark IV reports were commenced in 1974 or 1975, Kroger relies on the deposition testimony of its Nashville employee Evelyn L. Stevens given on two separate occasions, June 11, 2002 and January 7, 1994. Ms Stevens was first employed by the Kroger company in August of 1951 as a part-time worker in accounting at the Nashville, Tennessee location. She then became a payroll clerk in July of 1957 and secretary in the personnel department sometime in 1959. Sometime in the 1960s she became a benefit specialist. She retired on March 15, 1997. As a benefit specialist, it was her job to report to the funds the workers that were eligible for coverage. She was responsible at times for both the Nashville operating area and the Atlanta operating area. As such, she had occasion to do the reporting to the Central States Pension Fund. Although she cannot recall what years she began to report to the Fund, she does recall that she was reporting to the Fund up to the date of her retirement. Ms.

Stevens testified that for the Nashville center employees she would be told either in writing or orally by Ken Browning or Bill Stejskal when someone qualified to begin pension fund contributions. She would then put this information into the computer database and the Fund would receive a computer printout with the new employee's name on it. On the computer printout, Ms. Stevens would manually enter a notation of either "regular list" or "AD" by the employee's name to signify that this was a first time on the list for that employee. She further testified that when she was involved in the reporting on the Atlanta employees, she did the same thing. However, the company was not on the mainframe at that time. In the case of the Atlanta employees she sent both the Fund's 206 Form and a "Mark IV listing." She would mark opposite the person's name, the date they went on the regular seniority list and then add onto the Fund's three-ply form. A copy of the Mark IV report was sent to the Fund as well. The Mark IV report would include the employee's name, social security number, date of hire, birth date and number of weeks the individual was covered. Ms. Stevens also testified that records of the Mark IV reports for the Atlanta employees were maintained by Kroger.

In her June 11, 2002 deposition, Ms. Stevens testified that she began sending the Mark IV reports to the Fund either in 1974 or 1975 "I believe if I'm correct." However, earlier in the same deposition she indicates that she cannot recall whether it was in the 1970s or the 1980s that she became responsible for reporting on behalf of the workers at the Atlanta center. This is a crucial distinction. She also testified that she is sure Kroger had records back to 1974 and 1975 of reports presented to the Fund including the Mark IV reports, yet no records of Mark IV reports for the period prior to 1987 have ever been produced. She further testified that the Fund would

return a form to her indicating acceptance of the changes, which led her to believe that the Fund had no problem with the reporting that she had made the previous month.

Oddly, in her deposition of January 7, 1994 Ms. Stevens was even less definite in regards to these past dates and time periods. She testified that she was a personnel clerk for some period of time, but had no idea for how long. Nor did she remember when she went from personnel clerk to secretary, testifying that: "It all meshes together" in her mind. Again, when asked how long she was secretary to the assistant personnel manager, she testified: "I cannot tell you. It all runs together." She then became a "benefit specialist." She believes that was in the latter 1960s, but is not confident of that either. She does recall expanding the Nashville operation and taking over the handling of benefits reporting for the Atlanta operation sometime in 1974. When asked if she was familiar with the collective bargaining agreements in effect from 1976 to the present between Local 528 of the Teamsters and the Atlanta center, she replied "I don't honestly know at this point ..., I'm sorry. I don't know at the present time what they have. I may have known back in '76, but I don't recall right now." Although she was at one time the person who prepared the actual reporting forms with respect to contributions paid by Kroger to Central States Pension Fund on behalf of the workers at the Atlanta center, she cannot now recall during what time period or for how long she held that responsibility. She cannot recall who she communicated with at the Atlanta center for this information, nor can she recall if the reporting for Atlanta was done in the same fashion as for Nashville. Ms. Stevens also testified that it was not her job to know how long an employee at either the Nashville center or the Atlanta center would have to work before contributions were paid on his behalf, nor was it her function to calculate probation

periods for employees. She is not aware of how new employees at the Atlanta warehouse are classified. Yet, she discusses in a letter she wrote dated October 30, 1990 the late reporting of employees qualifying for the regular seniority roster under Teamsters Local 528. Further, she testified that she is not now aware of any differences that there might be in the treatment of newly-hired warehouse employees between Nashville and Atlanta, or between truck drivers and warehouse employees at the Atlanta operation.

Regarding the Fund's 1991 audit of the Kroger Nashville and Atlanta centers, Ms. Stevens recalls that an audit by Central States Pension Fund was performed, but not much more. She does not recall when she first became aware of the audit, how she first became aware, who responded to the Fund's initial letter, or even whether she corresponded with the Fund concerning the audit. She does recall having spoken to someone at the Fund on more than one occasion. In this regard she recalls one name, Bob Lavely. She cannot recall discussing the audit with anyone at Kroger except to say that her bosses, Steve Wood and David Avery, were aware of the audit. She does not recall the results of the audit. She cannot recall if there was a similar part-time/casual employee issue with respect to the Nashville location. She recalls that some changes were made in the Nashville audit after she discussed its findings with the Fund, but cannot recall what type of changes. Nor does she recall any changes resulting from the Atlanta audit.

From this testimony it is impossible to determine when the Fund began to receive the

information contained in the Mark IV reports. Had those reports been regularly delivered since the mid 1970's, as Kroger maintains, we would expect Kroger to have such records. Yet no such records are available for that time period. On the contrary, the earliest reports produced are for 1987. The statute of limitations did not begin to run until, with the exercise of reasonable diligence, the Fund would have become aware of Kroger's failure to pay. *Hallmark & Son Coal Co.*, at 343. Aside from the Mark IV reports the Fund relied on Kroger's self reporting by way of the Fund's 206 Form. This form did not contain the date of hire for new additions to the regular employee's list and, therefore, could not have served to put the Fund on notice.

Kroger also claims that an earlier 1980 audit of its Indianapolis facility should have put the Fund on notice. However, the Indianapolis facility operated under a different Local Supplement. The fact that one facility, located in a different state and operating under a different agreement with a different local, may have treated some employees improperly, cannot reasonably be said to require the Fund to suspect, investigate and audit all of its other localities. Were it so, the Fund would be on almost perpetual notice to continuously investigate each and every local.

Kroger argues that during the audit the Fund learned that Kroger was employing casuals for lengthy periods of time and that their employment was neither temporary nor irregular. In support of this argument Kroger cites to the testimony of Kevin O'Donnell, the Controller of the MidAtlantic Division for Kroger at the time of audit. In its post-trial brief Kroger refers to

O'Donnell's deposition testimony as "unambiguous." We disagree. What Kroger asks the court to conclude from O'Donnell's testimony is that the Fund was confronted during the Indianapolis audit with the same factual situation as at the Atlanta warehouse - the routine and intentional masquerading of regular workers as casuals - and that the Fund acquiesced to this use. But O'Donnell's testimony fails to support Kroger's argument. Although O'Donnell specifies that the main contention of the audit was that Kroger failed to pay contributions for workers labeled as casuals, he does not even come close to asserting that the fund ever knew and approved of Kroger's long term use of casual employees as part time regular workers. It is impossible to determine from O'Donnell's testimony what the reasons were for the compromise over the amount of the initial assessment - a common practice. If anything, what we can glean from O'Donnell's answers is that there were many meetings and discussions at various levels as to the *individual* assessments and whether those particular individuals were subject to the payment of contributions. From this testimony it is just as likely that the Fund determined some of the assessments it made were inappropriate because the individuals were truly casual employees and not regular employees masquerading as casuals. And if that were the case, then the results of this audit would be a disincentive to any further audits rather than a reason to conduct more audits at different locations. For example, when asked if he had any specific recollection of why the Fund agreed to reverse some of the audit findings that he disputed, O'Donnell said: "Because we didn't have to pay on casual laborers, and most of the audit findings were casual laborers." If indeed most of the workers assessed were true casual laborers, Kroger had no obligation to pay assessments as to those workers. But that is all we can infer from such a statement. We certainly cannot infer, as Kroger would have us do, that the Fund determined the laborers were actually

regular workers as defined in the Collective Bargaining Agreement and nevertheless acquiesced in Kroger's refusal to pay contributions for them. Had the Fund determined that a policy of hiring new workers in derogation of the CBA existed at the Indianapolis plant, and that the Local Supplements and conditions at both locations were sufficiently similar this might have created some incentive to investigate Atlanta as well. But there is no evidence that the Fund came to any such conclusion during the Indianapolis audit. Nor is there evidence that the Local Supplements and conditions were sufficiently similar. In short, the record fails to establish that as a result of the Indianapolis audit the Fund should have become aware of the need to investigate the possibility of Kroger's failure to pay for its regular Atlanta center workers.

Kroger also asserts the defense of laches. Because the parties entered into an agreement tolling the statute of limitations from 1993 until 2001, Kroger cannot claim laches for any delay during that period of time. Therefore, only the delay from 1977 to 1993 is at issue here. The defense of laches applies when a "plaintiff has waited for an unreasonable length of time to assert his claim and the defendant has been prejudiced by the delay." *Horbach v. Kaczmarek*, 288 F.3d 969, 973 (7th Cir. 2002). The Seventh Circuit, in *Teamsters & Employers Welfare v. Gorman Brothers Ready Mix*, 283 F.3d 877 (7th Cir. 2002), stated that "laches is thus a form of equitable estoppel rather than a thing apart." However, an examination of laches, as well as the *Gorman Brothers* opinion itself, makes clear that although laches is a form of equitable estoppel, it has different elements. Laches requires only (1) unreasonable delay and (2) prejudice to the other party as a result of that delay. In order to support a defense of laches, there must be a showing of both a lack of diligence by the party against whom the defense is asserted and prejudice to the

defending party. *Lingenfelter v. Keystone Consol. Industries, Inc.*, 691 F.2d 339 at 340 (7th Cir.

1982) (citing *Costello v. United States*, 365 U.S. 265, 282 (1961)). Under the two-prong test for

laches the plaintiff bears the burden of explaining its delay in bringing suit. *See Baker*

*Manufacturing Co. v. Whitewater Manufacturing Co.*, 430 F.2d 1008, 1011-15 (7th Cir. 1970),

*cert. denied*, 401 U.S. 956 (1971); *Boris v. Hamilton Manufacturing Co.*, 253 F.2d 526, 529 (7th

Cir. 1958). If the delay is inexcusable, then the defendant must show prejudice. *Lingenfelter*, 691

F.2d 339 at 340.


Kroger's claim in this lawsuit is, in essence, that Fund's delay in bringing this suit gave

Kroger a false sense of security that it would not be sued and could continue its practices. Thus,

according to Kroger, its detriment is twofold: (1) the length of time has prejudiced its ability to

defend itself through loss of evidence and witnesses; and (2) it would have changed its practices

earlier, thus reducing its liability, had it been sued earlier.


Many of the arguments above regarding the statute of limitations defense apply to this

laches defense as well. The Fund's delay cannot be deemed unreasonable for any period of time

during which it could not reasonably have known of the existence of the cause of action. Above,

we determined that the Fund was not put on such notice at any time prior to June 18, 1983. In

1984 the Fund sued twenty St.Louis area produce companies who, like Kroger, had adopted the

practice of labeling all newly-hired permanent employees as ineligible casual employees. The

fund lost this lawsuit at the district court level and it was not until 1990 that the district court's

ruling was reversed on appeal. It is not unreasonable for the Fund to have waited until it was given the green light in that case before it commenced lawsuits in other jurisdictions over the same issue. Further, the lawsuit in St. Louis ought to have put Kroger on notice, if it did not already know, that it was at risk of multiplying its own liability if it continued to operate under a system similar to the one being challenged in the lawsuit in St.Louis. Once the St. Louis lawsuit was filed, Kroger could no longer be under the belief that the Fund condoned its hiring practices in Atlanta. From that point on, Kroger can not claim that it justifiably and reasonably relied upon the Fund's failure to object.

In addition, even if the Fund's delay is deemed unreasonable, Kroger would have to show that it was prejudiced to prevail on its laches defense. Kroger cannot show prejudice because the only steps Kroger could have taken had it known previously of the Fund's position, would have been to pay the very contributions now in dispute. "There was also no resulting prejudice to Brown-Graves. Brown-Graves states that if it had been notified of Central States's claim sooner it could have 'taken steps to avoid being sued for the disputed contributions. However, the only "steps" Brown-Graves could have taken would have been to make the contributions. Consequently, the laches defense fails." *Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680, at 684 (6th Cir 2000).

Kroger also argues that it has openly used casuals from the outset and disclosed this use to the Fund each month on its 206 Forms and Mark IV Reports every month since the mid-1970s.

For the reasons indicated above the Court finds that the evidence does not establish that the Fund began receiving Kroger's Mark IV reports before1987. Further, the information on the Form 206 reports alone was insufficient to place the Fund on notice that Kroger was improperly labeling employees as casuals in derogation of the terms and definitions in the CBA. Even the receipt of the Mark IV reports and the Form 206 reports together, beginning in 1987, is insufficient to place the Fund on notice prior to its 1991 audit of the Atlanta warehouse. Kroger never informed the Fund that it was designating new hires as casuals even though the intent was that they be permanent regular workers. Had it done this, then the Fund would clearly have been on notice. Providing vague, hidden clues regarding starting dates, by way of the Mark IV reports, from which the Fund might be able to piece together the true state of affairs is not sufficient. Kroger had a duty to report to the Fund all workers that it hired with the intent of having them become permanent, regular workers so that the probationary period could be calculated and the commencement of contributions verified. The fund was justified in relying on Kroger to do just that. The Court finds that evidence fails to establish that the Fund delayed unreasonably or that Kroger justifiably relied upon the Fund's inaction.

Kroger also contends that its exposure to additional liability in the form of interests and penalties has been greatly increased by the Fund's delay. This Court disagrees. Even if the Fund's delay was unreasonable, any increase in liability for interest and penalties or loss of evidence or ability to defend must stop at the point when Kroger first became aware of the Fund's position with regard to the part-time/casual distinction. Once Kroger knew that the Fund disagreed with its use of the "casual" designation, its continued use of that designation was done

with full knowledge of the risk of incurring liability. So too, any failure on Kroger's part to preserve any evidence necessary to defend itself from that point forward, was done with full knowledge of the risk involved.

Similarly, Kroger cannot claim prejudice from any interest, penalties, liquidated damages or loss of ability to defend stemming from the parties' agreement to delay this cause of action. That was a conscious choice, made for Kroger's convenience and with its full knowledge of the risks inherent in contining its policies regarding the designation of casuals. As Kroger admits in its post trial brief, the Fund's audit of Kroger's Indianapolis facility in 1980 challenged Kroger's custom of designating employees as "casuals" when their employment was neither temporary nor irregular. At that point Kroger was clearly on notice that continued treatment of employees at any other facility who were neither temporary nor irregular as casuals would be challenged by the Fund. Kroger has failed to establish that prior to the time it knew or should have known that its practice was likely to be challenged it suffered any substantial increase in liability or loss of ability to defend itself.

In calculating its damages the Fund has proceeded on the premise that none of the newly-hired workers in the audit (Plaintiff Exs. 82, 83, 89 - 91) were true casuals and, therefore, contributions are owed on these employees from the day they completed the probationary period. Under §2.2 of the CBA, the probationary period is completed after 30 working days, not to exceed sixty calendar days. (Joint Stipulation of Facts, Exs. 1-5.) It then excluded any workers

who remained on Kroger's payroll for less than ninety days. Kroger argues that this ninety day definition of short-term is arbitrary, as there could have been many employees who fit the definition of a casual employee yet worked ninety or more days. Kroger points to the Fund's own definition of short-term as progressing from thiry days to ninety days to 120 days and even to nine months or 1000 hours in a twelve month period. Thus, Kroger argues, the Fund's calculation results in unfounded and speculative damages computations.

However, the true issue in determining a new employee's status is not how long he worked, but rather Kroger's intent at the time he was hired. If Kroger's intent was to hire a permanent regular worker, then contributions are owed after the completion of the thirty work day probationary period even if the worker only worked for one day thereafter. We have already determined that Kroger's use of the part-time hiring process was intended to provide it with regular, permanent employees and that all of Kroger's intended regular employees during the relevant time period were initially hired as part-time, non regular workers. In short, the reasonable inference from the evidence presented is that none of the new hires were true casuals. Thus, the Fund's use of the ninety day cutoff to allow for the remote possibility that Kroger may have hired some true casual employees is certainly reasonable.[4]

_____

[4] Much of the motive for hiring true casual employees is eliminated if the employer can, as Kroger was actually doing, hire regular workers without having to pay contributions for benefits. One of the major benefits of hiring true casuals is that the company avoids having to pay contributions to the Fund. If the employer can accomplish this with its regular part-time workers, there is little advantage to hiring a worker as a casual.

At any rate, it is Kroger's failure to accurately document its true intention upon hiring each employee that forces the Fund to rely upon evidentiary inferences. Kroger cannot be heard to complain that the Fund has failed to differentiate between any true casual employees hired under its scheme and those who were hired with the intent that they become permanent employees when it is Kroger's own actions that have made a mathematically precise determination impossible. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) (addressing FLSA); *see Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 697 (6th Cir. 1994) (applying *Anderson* to ERISA case). The fund is not required to call to the stand every worker hired during the relevant period to make its case. The Court is entitled to draw reasonable inferences from the evidence presented. By marking the applications of all part-time employees as a "casual" employees, Kroger has essentially camouflaged any true casual workers hired under its scheme during the relevant time period. If any existed, it is impossible to pick them out from the background of similarly designated part-time regular employees. Kroger has, under ERISA, a duty to keep accurate records of the hours worked by qualified employees. It has failed to do so. Its records are deficient. The inferences drawn by the Fund are reasonable and well grounded in the facts. The Fund has established a reasonable basis and methodology for calculating an estimate of the amount due. Where the fact of damage is certain, but the calculation of damages is uncertain due to an employer's violation of a statute's requirement to maintain records, the rule that prohibits recovery of speculative damages does not apply. *Anderson*, 328 U.S. at 688.

## CONCLUSION

For the reasons given above the Court finds for the plaintiff and against the defendant and

enters judgment as follows: (1) contributions in the amount of $554,088.00; (2) double interest in the amount of $1,792,189.08 through June 2003; plaintiffs are given 14 days to file an itemization of interest accruing from July 2003 to the date of this judgment, which is to be added to the interest award; (3) audit fees and costs in the amount of $13,838.14; (4) post-judgment interest to accrue at the prime rate in accordance with the Trust Agreement; and (5) attorney's fees and costs - plaintiff is instructed to pursue its request for attorneys fees and costs in accordance with our Local Rule 54.

**SO ORDERED**                    **ENTER:**

RONALD A. GUZMÁN
**District Judge**

G:\Guzman\Kroger Ruling.wpd